UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Angela A. Fries,

    Plaintiff,

v.                                                Civil No. 11-1052 (JNE/AJB)
                                              ORDER

TRI Marketing Corporation,

    Defendant.

Plaintiff Angela Fries ("Fries") brought suit against Defendant TRI Marketing Corporation ("TRI"), alleging violations of the Family Medical Leave Act ("FMLA"). Now before the Court is Defendant's Motion for Summary Judgment. For the reasons discussed below, the Court denies TRI's motion.

## I.    BACKGROUND

Fries began working for TRI in July 2006 as a telemarketer and then later as an administrative assistant. TRI terminated Fries' employment on July 14, 2010. At that time, Fries was suffering from a number of medical conditions, including herpes and a bladder disease called interstitial cystitis. During flare-ups of her interstitial cystitis, Fries experienced pain, as well as urgent and frequent urination. She made numerous visits to the doctor and/or emergency room each year related to her interstitial cystitis. She testified that she visited her doctor during the work day two to four times a month and went to the emergency room every two to three months. As a result of her condition, she was "quite often" late for work, went to the doctor more often than other employees, and called in sick more often than her co-workers.

Fries reported her doctor and emergency room visits to her immediate supervisor, Tara Koch. Sometime during the week of July 5, 2010, Fries had a discussion with Koch about taking an excessive number of breaks. Fries told Koch that she was experiencing a flare-up of her

1

interstitial cystitis, causing her to make frequent trips to the restroom. Koch believed that Fries was lying to her about the amount of break time Fries was taking.

Fries was not at work on Friday, July 9. She testified that on that day, she was "constantly" going to the bathroom and was in pain, and that on Saturday, July 10, she was in severe pain and confined to her bed. Early on Saturday morning she was having difficulty urinating, but by eight o'clock that evening, she was unable to urinate at all. On Sunday morning, July 11, Fries went to the emergency room, complaining that she was unable to urinate. Fries had a catheter placed and was evaluated by Dr. David J. Roberts, an emergency medicine physician. Dr. Roberts' notes from the ER visit stated:

> The patient is a 24-year-old white female who has not been able to urinate since last night around 8:00 p.m. She is quite uncomfortable. She rates her discomfort 7 on a scale of 10. She was recently diagnosed with herpes simplex genitalis and started on acyclovir. She has had previous urinary problems including chronic interstitial cystitis and required a catheter for urinary retention about five years ago.

Dr. Roberts concluded: "Urinary retention secondary to herpes simplex infection more likely than due to her chronic interstitial cystitis. This should be temporary and resolve in a few days." Fries' diagnoses from her ER visit were "urinary retention" and "herpes simplex type 2 vaginitis and probable urethritis." Dr. Roberts noted that the catheter was to remain in place for three days and could be removed on Wednesday, July 14. He prescribed antibiotics and pain medication and noted that Fries should follow up with her primary physician or urologist. Fries was discharged that day. The "return to work instructions" that Dr. Roberts provided stated that Fries "should be able to return to work in 2 days, July 13th" and that there would be no work limitations upon her return.

While Fries was in the emergency room, she contacted Koch via text and informed her that she was in the hospital, had a catheter put in, and had a doctor's note to miss work on

Monday, July 12th. According to Fries, Koch texted her back, stating that if Fries was absent on Monday, she would be fired. Fries did not work on Monday, July 12. She testified that she was in extreme pain and vomiting. She saw her primary physician, Dr. Michael H. Wetzel, who noted that Fries had been seen in the emergency room for urinary retention, was taking pain medication and antibiotics, and that the catheter was to stay in place for two more days, after which time she could come in to have it removed by the nurse. He also reviewed her positive herpes test with her.[1]

Fries returned to work on Tuesday, July 13. The catheter was still in place and the catheter drainage bag, which was collecting the urine, was visible to her co-workers. Fries gave Koch the note from Dr. Roberts.[2] According to Fries, although she was still in extreme pain and vomiting, she was able, with difficulty, to get her work done that day. She stated that she "was emotionally a wreck because of the pain." Koch encouraged Fries to go home, but Fries refused. Pat Leger, TRI's owner, testified that "[Koch] tried to send her home that morning. She said go home, and [Fries] wouldn't leave." Leger Dep. 92:17-20.

On Wednesday, July 14, Fries removed the catheter herself before going into work. She was summoned into Leger's office, where she met with both Leger and Koch. Leger informed Fries that she was being suspended. The details of this meeting are disputed. According to Fries, Leger told her she was being suspended because of her absence on Monday, July 12. She immediately objected to the suspension, believing that it was illegal to suspend someone for an absence for which there was a doctor's note. She threatened to contact an attorney and bring a lawsuit against TRI. TRI asserts that the suspension was related to other work misconduct, not

---

[1] Fries again saw Dr. Wetzel on July 26, 2010. Her symptoms had resolved by that time.

[2] It is unclear whether she gave Koch the note on Tuesday, July 13, or Wednesday, July 14.

Fries' absence on Monday, and that Fries did not express a belief that her suspension was illegal. Further, TRI contends that Fries only threatened to bring a lawsuit to receive unemployment compensation, rather than to enforce any FMLA rights.

It is undisputed, however, that Fries threatened some kind of lawsuit against TRI. Immediately thereafter, Leger decided to terminate Fries' employment.[3]  Leger testified that Fries' threat to sue TRI was at least "a little bit" of the reason for her termination.  Leger Dep. 6:14-15.  TRI provided Fries with the following written statement:

> Termination Reasons: Due to misconduct of working schedule, excessive time off and breaks, doesn't work with other employees well.  Originally was suspended for 30 days, threatened to sue company and management.  It was then decided that termination was the best option.

After TRI terminated Fries, her attorney contacted TRI to discuss the termination.  In response, TRI provided statements to Fries' attorney.  In one of those statements, dated September 22, 2010, Koch indicated that,

> [a]fter discussion with management, it was decided that [Fries] would be suspended for 30 days due to the fact that she had lied to me and had taken 50 minutes off for personal breaks in 4 hours. . . .  When [Fries] was informed of the suspension, she became visably angry and upset.  She would not listen to our reasoning for the suspension.  We were hoping that this would help straighten her out and get her back on track with work. . . .  [Fries] then threatened TRI and management with a lawsuit and left the premesis [sic].  It was then decided that [Fries] would be terminated for her actions and the owner, called her and informed her that she was terminated.

Fries brought suit in April 2011, assertion violations of her FMLA rights.

---

[3] Leger testified that he always intended to fire Fries—he planned on suspending her for thirty days and then firing her during her suspension.  The written statement he provided to her, however, states that after Fries threatened to sue TRI, "[i]t was *then* decided that termination was the best option." Ho Aff. Ex. 9 (emphasis added).  Viewed in the light most favorable to Fries, the evidence could indicate that Leger did not decide to terminate Fries until after she threatened to sue.

## II.     DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

FMLA prohibits any employer from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise, any right provided [by FMLA]" and from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful [by FMLA]." 29 U.S.C. § 2615(a)(1)-(2). Two types of claims exist under FMLA. *Stallings v. Hussmann Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006); *see also Lovland v. Emp'rs Mut. Cas. Co.*, No. 11-2076, 2012 WL 878564, at *3-4 (8th Cir. Mar. 16, 2012) (reaffirming the distinction between FMLA interference and retaliation claims). A claim for interference is supported by allegations "that an employer denied or interfered with [an employee's] substantive rights under the FMLA." *Stallings*, 447 F.3d at 1050. A claim for retaliation requires an employee to show "that the employer discriminated against [her] for exercising [her] FMLA rights." *Id.* Fries asserts both interference and retaliation claims against TRI.

**A. Interference Claim**

Fries asserts that TRI interfered with her exercise of her rights under FMLA by failing to advise Fries of her FMLA rights and by initially suspending, and then terminating, her employment as a result of missing work due to her bladder problems. To establish a claim for interference, "an employee must show only that he or she was entitled to the benefit denied." *Stallings*, 447 F.3d at 1050. To be entitled to the benefit, the plaintiff must establish that: (1) she suffered a serious health condition, *see* 29 U.S.C. § 2612(a)(1)(D); *Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1147 (8th Cir. 2001); and (2) she provided enough information to put her employer on notice that she might be in need of FMLA leave, *see* 29 U.S.C. § 2612(e)(2); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999). An employer's intent is irrelevant, *Stallings*, 447 F.3d at 1051, but an employer can avoid liability by showing that the employee's termination was unrelated to those benefits, *Throneberry v. McGehee Desha Cnty. Hosp.*, 403 F.3d 972, 980 (8th Cir. 2005). TRI argues that: (1) Fries was not qualified for benefits under FMLA because the condition for which she was absent from work does not qualify as a "serious health condition" under the FMLA; (2) even if Fries had a "serious health condition," she failed to provide the requisite notice; (3) TRI did not deny Fries any FMLA benefit because it granted her leave; and (4) Fries' termination was unrelated to her leave.

*1. Serious Health Condition*

FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). A "serious health condition" is "an illness, injury, impairment, or physical or mental condition that involves . . . continuing treatment by a health care provider." *Id.*

6

§ 2611(11). The regulations promulgated by the United States Department of Labor provide several definitions of what constitutes a "serious health condition involving continuing treatment by a health care provider." *See* 29 C.F.R. § 825.115; *see also* 29 U.S.C. § 2654 (authorizing the Secretary of Labor to prescribe implementing regulations). One definition provides:

> A serious health condition involving continuing treatment by a health care provider includes . . . [a] period of incapacity of more than three consecutive, full calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves: (1) Treatment two or more times, within 30 days of the first day of incapacity . . . by a health care provider . . . ; or (2) Treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of the health care provider.

29 C.F.R. § 825.115(a). It is undisputed that Fries was treated by health care professionals at least two times within thirty days of the onset of her bladder problems. TRI argues, however, that Fries was not incapacitated for more than three consecutive days.

"Incapacity" is defined as the "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." *Id.* § 825.113(b). Fries testified that on Friday, July 9, she was "constantly" going to the bathroom. By Saturday, July 10, Fries stated that she was confined to her bed and in extreme pain. By eight o'clock on Saturday evening, Fries was completely unable to urinate. The next morning, on Sunday, July 11, Fries went to the emergency room, where the medical providers inserted a catheter to help her urinate. The catheter was to remain in place for several days. Fries' treating physician in the emergency room provided her with a note indicating that she was not to go into work on Monday. Fries remained at home, per the doctor's orders, on Monday, July 12. These are the four days she claims she was incapacitated. TRI does not dispute that Fries was incapacitated on Sunday and Monday due to her urinary retention. TRI does dispute, however, that Fries was incapacitated on Friday and Saturday.

7

TRI notes that the symptoms Fries experienced on Friday and Saturday (urinary frequency and pain) are different than the symptoms she experienced on Sunday and Monday (urinary retention), which caused her absence from work. TRI asserts that Fries' interstitial cystitis caused her frequent urination on Friday and Saturday, and that herpes caused her inability to urinate on Sunday and Monday. Thus, according to TRI, the condition for which Fries was absent from work (herpes) did not involve a period of incapacity lasting for longer than three days. The medical record indicates that Fries' treating physician believed that the urinary retention was due to herpes, rather than interstitial cystitis. The notes from the follow-up visit do not state a cause for the ER visit, but mention only herpes, and not interstitial cystitis. Urinary retention does not appear to be a recognized symptom of interstitial cystitis.[4] Thus, there is no medical evidence to support Fries' belief that her urinary retention was due to interstitial cystitis alone, rather than herpes or some combination of the two conditions.

That, however, does not end this Court's inquiry. When granting all reasonable inferences in favor of Fries, it is possible that the symptoms she attributed to her interstitial cystitis on Friday and Saturday were actually due to herpes. Fries is not a physician, nor does she have any medical training. It is undisputed that a physician diagnosed Fries with a urinary problem on Sunday, and it is reasonable to infer that her problem on Sunday was related to the urinary problems she had been experiencing for the prior two days.

Moreover, even if it was, in fact, interstitial cystitis that caused the majority of her symptoms on Friday and Saturday, the interstitial cystitis and herpes may be considered together when determining whether Fries' illness constituted a "serious health condition" under FMLA.

---

[4] Fries asserts that urinary retention can be a symptom of interstitial cystitis. She believes her first episode of urinary retention, requiring catheterization in 2006, was caused by interstitial cystitis. She testified, however, that the 2006 incident may have been caused by kidney stones, and her medical record only supports a finding of urinary retention secondary to kidney stones.

"[S]everal diagnoses, if temporally linked, no one of which rises alone to the level of a serious health condition, if taken together, [can] constitute a serious health condition." *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024-25 (7th Cir. 1997) (explaining that "it is not the disease that receives leave from work; it is the person" and that "multiple illnesses" may have "a serious impact"); *see also Caldwell v. Holland of Tex., Inc.*, 208 F.3d 671, 676 (8th Cir. 2000) (citing *Price* and noting that "medical diseases do not afflict people in methodical and predictable ways: certain serious diseases can elude diagnosis, change in severity, and have cumulative effects on the body over time"). Here, it is reasonable to consider two diseases, which are temporally linked and affected the same organ system, together when determining whether Fries suffered from a "serious health condition." Thus, there is a genuine issue of material fact as to whether the condition or conditions for which Fries missed work caused her to be incapacitated for more than three days.

TRI also argues that there is insufficient evidence regarding Fries' alleged incapacity on Friday and Saturday. Although there are medical records supporting her claim of incapacity on Sunday and Monday, the only evidence directly relating to Fries' incapacity on Friday and Saturday is her own testimony. This, TRI asserts, is insufficient to raise a genuine issue of material fact. This Court has previously noted that "[g]enerally, a plaintiff's own statement is insufficient to establish incapacity under the FMLA." *Brehmer v. Xcel Energy, Inc.*, Civ. No. 06-3294 (JNE/JJG), 2008 WL 3166265, at *8 (D. Minn. Aug. 4, 2008). But a plaintiff's testimony, in conjunction with subsequent medical records, may be sufficient. *See Rankin v. Seagate Techs., Inc.*, 246 F.3d 1145, 1148-49 (8th Cir. 2001). In *Rankin*, the plaintiff testified that she was "too sick to work" prior to an October 8th medical appointment. *Id.* The medical records from the October 8th appointment indicated that the plaintiff claimed she had been

suffering for the same symptoms for a week. *Id.* The Eighth Circuit Court of Appeals found that although the plaintiff "did not produce an overabundance of evidence," the testimony and medical records "were, in sum, sufficient to create a genuine issue of material fact regarding her incapacity prior to October 8." *Id.* In *Schaar v. Lehigh Valley Health Servs., Inc.*, 598 F.3d 156, 161 (3d Cir. 2010), the Third Circuit followed the Eighth Circuit's approach, holding that "[s]ome medical evidence is still necessary" and "an employee may satisfy her burden of proving three days of incapacitation through a combination of expert medical and lay testimony." In that case, the plaintiff's physician noted that the plaintiff was incapacitated for two days because of her illness; the plaintiff testified that she was also incapacitated for an additional two days. *Id.* The court found that the treating physician's opinion that the plaintiff was incapacitated for two days combined with the plaintiff's lay testimony that she was incapacitated for an additional two days created a material issue of fact as to whether the plaintiff was incapacitated for more than three days. *Id.*

Fries testified that her urinary problems caused her to be in extreme pain and bedridden on Friday and Saturday. She produced medical records from her ER visit and a note from the ER physician indicating that her urinary problems rendered her incapacitated on Sunday and Monday. As in *Rankin* and *Schaar*, Fries has produced more than merely her own statement—she has also produced medical evidence supporting her testimony. While there may not be "an overabundance of evidence," the Court finds that it is sufficient to raise a genuine issue of material fact on the question of incapacity.

For the reasons stated above, there is a genuine issue of material fact as to whether Fries suffered from a "serious health condition" under FMLA, as defined under 29 C.F.R. § 825.115(a).[5]

## 2. Notice

"When leave is needed for an unforeseeable event, notice is required 'as soon as practicable.'" *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008) (quoting 29 C.F.R. § 825.302(a)). "A claim under the FMLA cannot succeed unless the plaintiff can show that he gave his employer adequate and timely notice of his need for leave . . . ." *Chappell v. Bilco Co.*, No. 11-1243, 2012 WL 1123847, at *4 (8th Cir. Apr. 5, 2012) (internal quotation marks omitted). "Adequate notice requires 'enough information to put the employer on notice that the employee may need FMLA leave.'" *Id.* (quoting *Thorson v. Gemini, Inc.*, 205 F.3d 370, 381 (8th Cir. 2000)). An employee, however, "need not invoke the FMLA by name in order to put an employer on notice that the Act may have relevance to the employee's absence from work." *Id.* (quoting *Thorson*, 205 F.3d at 381). "Whether an employee gave sufficient information to put his or her employer on notice that an absence may be covered by the FMLA is a question of fact for the jury." *Phillips*, 547 F.3d at 909.

It is undisputed that TRI was aware that Fries suffered from some kind of bladder condition. It is also undisputed that Fries texted her supervisor, Koch, on Sunday when she was in the ER, informing Koch that she was in the emergency room, had a catheter placed, and had

---

[5] Fries has not, however, produced evidence that satisfies the other definitions of "serious health condition" under FMLA. Fries produced no evidence that herpes is a chronic condition, required periodic visits, or continued over a period of time. *See* 29 C.F.R. § 825.115(c). Rather, the record reveals that she had been recently diagnosed with herpes, and her symptoms had resolved within two weeks. There also is no evidence to support Fries' assertion that she received "multiple treatments" for herpes or that had she not had the catheter inserted, she would have been incapacitated for more than three days. *See id.* § 825.115(e)(2). In fact, the ER record noted that her condition was "temporary" and should resolve.

11

received a doctor's note excusing her from work on Monday. When Fries returned to work on Tuesday, she had a catheter in place and the catheter drainage bag, filled with urine, was visible to both Koch and Leger. Not only did they see the catheter bag, but Koch even tried to persuade Fries to go home because of her condition. Viewing this evidence in the light most favorable to Fries, a reasonable jury could conclude that she gave sufficient information to put TRI on notice that her absence may be covered by FMLA.[6]

### 3. Denial of a Benefit

TRI asserts that it did not interfere with Fries' FMLA rights because, according to TRI, it did, in fact, grant Fries leave for Monday, July 12. Fries maintains that TRI did *not* grant her leave on Monday, July 12. It is merely undisputed that Fries did not go to work on Monday. "Interference includes 'not only refusing to authorize FMLA leave, but discouraging an employee from using such leave.'" *Stallings*, 447 F.3d at 1050 (quoting 29 C.F.R. § 825.220(b)). "An employer's action that deters an employee from participating in protected activities constitutes an 'interference' or 'restraint' of the employee's exercise of his rights." *Id.* "When an employer attaches negative consequences to the exercise of protected rights, it has 'chilled' the employee's willingness to exercise those rights . . . ." *Id.*

---

[6] TRI asserts that because it was not unusual for Fries to go to the ER, it was not on notice that this particular instance involved a serious health condition covered by FMLA. TRI also contends that Fries did not explicitly inform it that her ER visit and absence from work were due to her bladder disease. The Court is not persuaded. Fries not only informed her supervisor that she was in the ER and had a catheter placed, but when she returned to work, her catheter drainage bag was plainly visible. One need not be a trained physician to make the connection between Fries' absence and a potentially serious bladder disease. A reasonable jury could find that Fries provided sufficient notice. If TRI had any doubt as to whether Fries' condition was covered under FMLA, it was TRI's duty to make further inquiry. *See Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 852-53 (8th Cir. 2002) (citing *Thorson*, 205 F.3d at 381-82); *see also* 29 U.S.C. § 2613(a) (stating that an employer may require that a request for leave is supported by certification from a health care provider). It is undisputed that TRI requested no such certification in this case.

Fries testified that when she texted Koch from the ER and informed her that she had a doctor's note excusing her from work, Koch told her that if she was absent from work on Monday she would be terminated. This alleged threat, in conjunction with Fries' immediate termination upon her return, could lead a reasonable jury to find that Fries was not granted leave, or at the very least, that Koch discouraged Fries from taking medical leave. This is a fact dispute and not appropriate for summary judgment.

Fries also contends, however, that TRI deprived her of an FMLA benefit by failing to advise her of her FMLA rights. She asserts that such failure rendered her unable to exercise her FMLA rights in a meaningful way, because had she been properly informed, she would have taken more than one day off. This Court has previously noted that an allegation that an employer failed to provide an employee with information and paperwork concerning FMLA rights does not by itself create a separate cause of action under FMLA. *See Ruiz v. Ostbye & Anderson, Inc.*, Civ. No. 02-2954 (JNE/JGL), 2004 WL 2237051 (D. Minn. Sept. 28, 2004). As with any claim under the FMLA, an employee must prove not only that the employer violated § 2615, but also that "the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). In *Conoshenti v. Public Service Electric & Gas Co.*, 364 F.3d 135 (3d Cir. 2004), the Third Circuit held that the plaintiff's "failure to advise" claim was a "viable theory of recovery" because had he been informed of his right to twelve weeks of FMLA leave, he would have structured his leave differently so as to preserve the job protection afforded by the Act. The court, however, required that the plaintiff show that the employer's failure to advise resulted in prejudice. *Id.* at 143-44 (stating that the plaintiff must "establish that this failure to advise rendered him unable to exercise that right in a meaningful way, thereby causing injury" and that there is actionable "interference" if the plaintiff "is able to show prejudice as a result of

13

that violation"); *see also Winship v. Dakota Cnty.*, Civil No. 07-171 (JRT/FLN), 2008 WL 4151803, at *7 ("An employer's failure to advise an employee of FMLA rights may constitute interference if the employee establishes that the failure to advise rendered her unable to exercise her FMLA rights in a meaningful way and thereby caused injury."); *c.f. Hofferica v. St. Mary Med. Ctr.*, Civil Action No. 10-6026, 2011 WL 5837152, at *8 (E.D. Pa. Nov. 18, 2011) ("A plaintiff cannot allege that an employer's 'failure to advise rendered him unable to exercise that right in a meaningful way, thereby causing injury,' merely by claiming damages for such a perceived wrong." (citation omitted)).

In *Ragsdale v. Wolverine Worldwide, Inc.*, 218 F.3d 933, 939-40 (8th Cir. 2000), *aff'd*, 535 U.S. 81 (2002), the Eighth Circuit noted that there may be some situations in which an employer's failure to give notice "may function to interfere with or to deny an employee's substantive FMLA rights," such as when an employee exceeds her leave because she was not notified that her leave was designated as FMLA leave and thus did not know she had only twelve weeks. *See also* 29 C.F.R. § 825.301(e) (explaining that if an employer fails to timely designate leave, and such failure causes the employee to suffer harm, it may constitute interference—for example, if an employee took leave to care for a child, believing that it would not count toward her FMLA entitlement, and then planned on later using FMLA leave to provide care for a spouse at a later date, the employee might be able to show that harm occurred as a result of the employer's failure to designate the leave properly).

It is undisputed that TRI never advised Fries of her FMLA rights at the time Fries requested leave. Leger testified that he "didn't really care whether it was FMLA or not." Leger Dep. 76:1-2. Leger, in fact, believed FMLA to be an *employer* protection statute, "a protection for the employer where you don't have to pay employees if they take off for a serious health

condition." *Id.* at 76:6-17.  Fries testified that had she been informed that she could have taken more time off, she would have.  She has produced no evidence, however, that TRI's failure to inform her of her FMLA rights caused injury or prejudiced her in any way.  Although Fries may have opted to stay home on Tuesday and Wednesday had she known about FMLA, there is no indication that her injuries (i.e., suspension and/or termination) were caused by her taking only one day, rather than two or three days, of medical leave.  The record indicates that she would likely have suffered the same injury regardless of the number of days she took leave or whether her leave was FMLA-eligible.  Unlike the plaintiffs in the cases discussed above, Fries has offered nothing to show how her injury could have been avoided had she received notice of her rights or that she was prejudiced by TRI's failure to advise her of her FMLA rights.  Without evidence of injury or prejudice resulting from TRI's failure to advise, Fries cannot establish that such failure constituted "interference" under FMLA.  Thus, to the extent that her interference claim is based on TRI's failure to advise her of her FMLA rights, the claim fails.

## 4.  *Termination Related to FMLA Leave Benefits*

TRI asserts that it would have made the same termination decision even had Fries not exercised her FMLA rights.  TRI argues that Leger had already decided to terminate Fries' employment prior to her absence from work on Monday, July 12, based on other work misconduct, such as tardiness, excessive breaks, absenteeism, and complaints from co-workers.  Thus, according to TRI, Fries' termination was unrelated to her medical absence.  Fries, however, contends that she was initially suspended, and then terminated, because of her absence on Monday.  According to Fries, Koch threatened her on Sunday that if she missed work on Monday, she would be fired.  Fries was then fired two days after her absence.  The termination letter and Koch's subsequent statement suggest that Fries was only going to be suspended

because of her alleged work misconduct—it was only after Fries threatened to sue that the termination decision was made. Thus, there is a genuine issue of material fact as to whether TRI would have terminated Fries had she not exercised her FMLA rights.

For the reasons discussed above, the Court finds that there are sufficient fact disputes to preclude summary judgment on Fries' FMLA interference claim.

## B. Retaliation Claim

The FMLA "prohibits retaliation against an employee who exercises her FMLA rights." *Lovland*, 2012 WL 878564, at *3. Retaliation claims arise under 29 U.S.C. § 2615(a)(2), which prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful [by FMLA]." [7] *See also Lovland*, 2012 WL 878564, at *3 (classifying retaliation claims under § 2615(a)(2) and "interference" claims under § 2615(a)(1)). Unlike an interference claim, a claim for retaliation requires an employee to

---

[7] The FMLA regulations provide that employees are also "protected if they oppose any practice which they *reasonably believe* to be a violation of the Act or regulations." 29 C.F.R. § 825.220(e) (emphasis added). The few courts that have interpreted this provision have found that a plaintiff states a valid retaliation claim where she opposes a practice she reasonably, but incorrectly, believes violates the FMLA. *See, e.g., Behringer v. Lavelle School for the Blind*, No. 08 Civ. 4899(JGK), 2010 WL 5158644, at *14 (S.D.N.Y. Dec. 17, 2010) (finding that the plaintiff satisfied the first element of a prima facie case of FMLA retaliation where "she honestly believed" that her employer "violated her rights under the FMLA"); *Rasic v. City of Northlake*, No. 08 C 104, 2010 WL 3365918 (N.D. Ill. Aug. 24, 2010) ("Department of Labor regulations make clear that the fact that a person mistakenly asserts rights under FMLA that he does not actually possess does not bar a retaliation claim, so long as the person reasonably believes that he has those rights."); *Wood v. Handy & Harman Co.*, No. 05-CV-532-TCK-FHM, 2006 WL 3228710, at *4 (N.D. Okla. Nov. 6, 2006) (finding that "a plaintiff in this type of FMLA retaliation case does not have to show that the conduct opposed was *actually* unlawful in order for his opposition to be protected," but that he "can also demonstrate he engaged in protected activity if he *reasonably believed* such decision violated . . . FMLA rights"); *Cloar v. Kohler Co.*, No. 05-1150-T/AN, 2005 WL 2396643, at *3 (W.D. Tenn. Sept. 26, 2005) (finding that the plaintiff stated a retaliation claim "on the grounds that she was fired merely for requesting FMLA leave, regardless of whether her absences were, in fact, FMLA-qualifying"). Because the Court finds that there are genuine issues of material fact as to whether TRI actually violated the FMLA, the Court need not address the reasonableness of Fries' belief that TRI's actions violated her rights under FMLA.

establish that the employer acted with retaliatory intent. *Id.* An employee can prove retaliatory intent with direct evidence or by satisfying the burden-shifting framework articulated in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Stallings*, 447 F.3d at 1051-52. If there is direct evidence of retaliatory animus, a court applies the mixed-motives test set forth in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 258 (1989). *See King v. Hardesty*, 517 F.3d 1049, 1057-58 (8th Cir. 2008). The mixed-motives test places the burden on "the employer to show that it more likely than not would have made the same decision without consideration of the illegitimate factor." *Id.* at 1057 (internal quotation marks omitted). "[E]vidence of additional motives, and the question whether the presence of mixed motives defeats all or some part of plaintiff's claim, are trial issues, not summary judgment issues." *Id.* (internal quotation marks omitted).

     Fries alleges that TRI violated the FMLA by retaliating against her for threatening to sue to enforce her FMLA rights. Fries contends that she twice protested that punishing her for her Monday absence would be illegal. First, according to Fries, Koch told her that if she missed work on Monday she would be fired, to which Fries responded that firing her would be illegal. Second, when Leger and Koch informed Fries of her suspension, Fries asserted that it was illegal to suspend someone for an absence that was excused by a physician. Immediately after Fries' threatened a lawsuit, Leger terminated her employment. It is undisputed that Fries' threat was at least "a little bit" of the reason for her termination. The termination letter, as well as Koch's subsequent statement, indicated that Fries was initially going to be suspended until she threatened to bring a lawsuit, and "[i]t was then decided that termination was the best option." If the jury believes Fries' testimony that her threatened lawsuit was related to the illegality of her suspension, rather than recovering unemployment compensation, then Leger's testimony, the

17

termination letter, and Koch's statement are direct evidence of retaliation. As a result, the issue of whether TRI would have terminated Fries regardless of Fries' threatened lawsuit is an issue that must be resolved at trial. Accordingly, summary judgment on Fries' FMLA retaliation claim is not warranted.

### III.   CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.  TRI's Motion for Summary Judgment [Docket No. 11] is DENIED.

Dated: April 23, 2012

> s/ Joan N. Ericksen
> JOAN N. ERICKSEN
> United States District Judge